People v Burton (2021 NY Slip Op 00716)





People v Burton


2021 NY Slip Op 00716


Decided on February 5, 2021


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on February 5, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CENTRA, J.P., PERADOTTO, NEMOYER, TROUTMAN, AND WINSLOW, JJ.


800 KA 18-00281

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
COURTNEY BURTON, DEFENDANT-APPELLANT. 






FRANK H. HISCOCK LEGAL AID SOCIETY, SYRACUSE (PAUL J. CONNOLLY OF COUNSEL), FOR DEFENDANT-APPELLANT. 
WILLIAM J. FITZPATRICK, DISTRICT ATTORNEY, SYRACUSE (BRADLEY W. OASTLER OF COUNSEL), FOR RESPONDENT. 


 Appeal from a judgment of the Onondaga County Court (Thomas J. Miller, J.), rendered December 1, 2017. The judgment convicted defendant upon a jury verdict of attempted murder in the second degree (two counts), assault in the first degree (two counts) and criminal possession of a weapon in the second degree. 
It is hereby ORDERED that the judgment so appealed from is unanimously affirmed.
Memorandum: Defendant appeals from a judgment convicting him upon a jury verdict of two counts each of attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]) and assault in the first degree (§ 120.10 [1]) and one count of criminal possession of a weapon in the second degree (§ 265.03 [3]). We reject defendant's contention that the conviction of two counts of attempted murder is not supported by legally sufficient evidence that he intended to kill the victims. The evidence established, inter alia, that defendant repeatedly fired a loaded handgun at the victims at close range, striking one of the victims in the chest, back, and arm and striking another victim in the arm. Video evidence also showed that prior to the shootings, defendant confronted one of the victims inside a club. After the victim left the club, defendant also left the club and approached the victims' vehicle in the parking lot, where he appeared to re-engage in a verbal altercation with the victims before shooting repeatedly into their vehicle. Thus, viewing the evidence in the light most favorable to the People (see People v Contes, 60 NY2d 620, 621 [1983]), we conclude that the evidence is legally sufficient to establish that defendant had the requisite intent (see People v Williams, 154 AD3d 1290, 1291 [4th Dept 2017], lv denied 30 NY3d 1110 [2018]). Furthermore, viewing the evidence in light of the elements of the crime of attempted murder in the second degree as charged to the jury (see People v Danielson, 9 NY3d 342, 349 [2007]), we reject defendant's contention that the verdict on those counts is against the weight of the evidence (see generally People v Bleakley, 69 NY2d 490, 495 [1987]).
Defendant contends that County Court erred in refusing to suppress a parole officer's identification of him as the shooter depicted in surveillance video of the shootings on the basis that the police-arranged procedure was unduly suggestive. We agree. When the police show a noneyewitness a recording for the purpose of determining whether the noneyewitness is able to identify the perpetrator as a person with whom he or she is familiar, "[t]he only apparent risk with such a witness [is] that the police might suggest that the voice [or person depicted] on the recording [is] that of a particular acquaintance" (People v Gambale, 150 AD3d 1667, 1668 [4th Dept 2017] [internal quotation marks omitted]; see People v Collins, 60 NY2d 214, 220 [1983]).
Here, the evidence at the suppression hearing established that the shooting was captured on surveillance video and that, as part of the investigation, a police detective asked defendant's parole officer to view the surveillance video and determine if he recognized anyone depicted therein. The detective informed the parole officer that defendant was the suspected shooter, and [*2]the parole officer identified defendant as the shooter in the video. We conclude that, by contacting the parole officer and discussing defendant with him prior to showing him the video, the detective engaged in the type of unduly suggestive behavior identified in Collins and Gambale inasmuch as his comments improperly suggested to the parole officer that the person he was about to view was defendant (see Collins, 60 NY2d at 220; Gambale, 150 AD3d at 1669).
We conclude, however, that the error in admitting the parole officer's in-court identification of defendant is harmless beyond a reasonable doubt (see People v Clyde, 18 NY3d 145, 153-154 [2011], cert denied 566 US 944 [2012]; People v Parker, 304 AD2d 146, 158 [4th Dept 2003], lv denied 100 NY2d 585 [2003]). The surveillance video establishes that the shooter wore a gray hooded sweatshirt and a black baseball cap with the letter "A" on it. Other witnesses, including a police detective who had several interactions with defendant prior to the shooting and defendant's cousin, who was with defendant on the morning of the shootings and appeared with defendant in the surveillance video, identified defendant in court and in the video recording as the person who was wearing the gray hooded sweatshirt and black baseball cap with the letter "A" on the front. In addition, defendant's cousin testified that he saw defendant approach the victims' car and extend his arm toward their vehicle, that he then heard the gunshots, and that he drove defendant to defendant's residence after the shootings. The testimony of defendant's cousin was corroborated by evidence from the city's traffic camera system, which depicted the white Ford Taurus driven by defendant's cousin as it traveled from the parking lot where the victims were shot to the street where defendant lived. The police executed a search warrant at defendant's residence, where they recovered, among other things, a gray hooded sweatshirt and a black baseball cap with the letter "A" on the front. Furthermore, after defendant was arrested, he made phone calls from the interrogation room requesting that other people go to his residence to retrieve a gray sweatshirt and a black hat with an "A" on it or, in the alternative, wash the sweatshirt in the washing machine with bleach. In recorded jailhouse telephone calls, defendant solicited others to contact the victims and promise them money if they did not identify him as the shooter. Defendant also asked others to contact his cousin to convince him to change his story to police. Under these circumstances, the proof of defendant's guilt is overwhelming and there is no reasonable possibility that the jury would have acquitted defendant were it not for the identification by defendant's parole officer (see Clyde, 18 NY3d at 154; see generally People v Crimmins, 36 NY2d 230, 237 [1975]).
We reject defendant's contention that the court erred in denying his motion to suppress statements because he was unlawfully arrested without a warrant. Prior to defendant's arrest by members of the Syracuse Police Department and parole units, two people who knew defendant positively identified him as the shooter depicted in the video recording, thereby providing probable cause for his arrest (see generally People v Davis, 294 AD2d 872, 873 [4th Dept 2002]). Furthermore, although defendant was on parole at the time of the arrest, the record does not support a finding that parole officers acted as a conduit for the police or that defendant was arrested for a parole violation as a pretext for taking him into custody so that police could investigate the shootings.
Even assuming, arguendo, that defendant was arrested for a parole violation prior to the issuance of a parole warrant, defendant knowingly and voluntarily waived his Miranda rights before speaking with the detective, and his statements were sufficiently "attenuated from the improper detention; in other words, [they were] acquired by means sufficiently distinguishable from the arrest to be purged of the illegality" (People v Buchanan, 136 AD3d 1293, 1294 [4th Dept 2016], lv denied 27 NY3d 1129 [2016] [internal quotation marks omitted]; see also People v Bradford, 15 NY3d 329, 333 [2010]).
We reject the further contention of defendant that he was denied effective assistance of counsel (see generally People v Baldi, 54 NY2d 137, 147 [1981]). " '[I]t is incumbent on defendant to demonstrate the absence of strategic or other legitimate explanations' for [defense] counsel's alleged shortcomings" (People v Benevento, 91 NY2d 708, 712 [1998], quoting People v Rivera, 71 NY2d 705, 709 [1988]). Defendant failed to meet that burden. The alleged instances of ineffective assistance concerning defense counsel's failure to make various objections or to seek curative instructions are "based largely on [defendant's] hindsight disagreements with . . . trial strategies, and defendant failed to meet his burden of establishing the absence of any legitimate explanations for those strategies" (People v Rogers, 70 AD3d 1340, 1341 [4th Dept 2010], lv denied 14 NY3d 892 [2010], cert denied 562 US 969 [2010] [internal [*3]quotation marks omitted]).
Defendant failed to preserve for our review his contention that he was deprived of a fair trial by the court's Molineux ruling, which permitted the People to elicit testimony that defendant was on parole at the time of the shootings and that he had prior interactions with a police detective who was a member of the Gang Violence Task Force. We decline to exercise our power to review the unpreserved contention as a matter of discretion in the interest of justice (see CPL 470.15 [6] [a]; see also Rogers, 70 AD3d at 1340).
The sentence is not unduly harsh or severe. Finally, we have considered defendant's remaining contentions and conclude that none warrants reversal or modification of the judgment.
Entered: February 5, 2021
Mark W. Bennett
Clerk of the Court