People v Wilkins (2023 NY Slip Op 02807)

People v Wilkins

2023 NY Slip Op 02807

Decided on May 25, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:May 25, 2023

111627 113426 
[*1]The People of the State of New York, Respondent,
v
Jovan A. Wilkins, Appellant.

Calendar Date:March 29, 2023

Before:Egan Jr., J.P., Lynch, Aarons, Fisher and McShan, JJ. 

Martin J. McGuinness, Saratoga Springs, for appellant.
David J. Clegg, District Attorney, Kingston (Joan Gudesblatt Lamb of counsel), for respondent.

McShan, J.
Appeals (1) from a judgment of the County Court of Ulster County (Donald A. Williams, J.), rendered January 18, 2019, upon a verdict convicting defendant of the crime of assault in the first degree, and (2) by permission, from an order of said court (James R. Farrell, J.), entered April 20, 2022, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
In December 2017, a fight involving several individuals broke out at a house party in the Town of Plattekill, Ulster County, during which the victim was stabbed multiple times. Following an investigation, defendant was charged by indictment with assault in the first degree and attempted murder in the second degree. At the conclusion of the ensuing jury trial, defendant was found guilty of assault in the first degree and was acquitted of the remaining charge. Defendant was sentenced to a prison term of 18 years to be followed by five years of postrelease supervision. Thereafter, defendant moved pursuant to CPL 440.10 (1) (h) to vacate the judgment of conviction on the ground of a Brady violation related to certain impeachment evidence of one of the People's witnesses. County Court (Farrell, J.) denied defendant's motion without a hearing based upon its determination that there was no reasonable possibility that a different verdict would have resulted had the impeachment material been provided prior to trial. Defendant appeals from the judgment of conviction and, by permission, the denial of the CPL 440.10 motion.
We initially turn to defendant's weight of the evidence challenge, where "we [must] first determine whether, based upon all of the credible evidence, a different verdict would have been unreasonable and, if it would not have been, we then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Taylor, 207 AD3d 806, 807 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 942 [2022]). Relevant here, "[a] person is guilty of assault in the first degree when[,] . . . [w]ith intent to cause serious physical injury to another person, he [or she] causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.10 [1]). As defendant "advances a justification defense regarding the use of deadly physical force, the People are obliged to demonstrate beyond a reasonable doubt that he
. . . did not believe deadly force was necessary or that a reasonable person in the same situation would not have perceived that deadly force was necessary" (People v Graham, ___ AD3d ___, ___, 2023 NY Slip Op 01819, *1 [3d Dept 2023] [internal quotation marks, brackets and citations omitted]; see People v Every, 146 AD3d 1157, 1161 [3d Dept 2017], affd 29 NY3d 1103 [2017]). "However, a person who reasonably [*2]believes that another is about to use deadly physical force is not free to reciprocate with deadly physical force if such person knows that he or she can with complete safety as to himself, herself and others avoid the necessity of so doing by retreating" (People v Cutting, 206 AD3d 1281, 1281 [3d Dept 2022] [internal quotation marks, brackets and citations omitted]; accord People v Decamp, 211 AD3d 1121, 1122 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]).
At trial, the People first called the victim, an off-duty correction officer, who testified that he accompanied his cousin and an acquaintance to a house party and, after having two beers, prepared to leave. As he exited out the front door with his cousin, the victim saw his acquaintance on the ground being punched, kicked and stomped on by three men, including defendant and another individual later identified as defendant's brother. The victim attempted to render aid to his acquaintance by pushing defendant and his brother, at which point he suddenly felt a sharp throbbing pain in his back. Realizing he had been stabbed, the victim turned and found himself face-to-face with defendant, who, according to the victim, stabbed him two more times in the abdominal area. The victim stated that he observed a black object in defendant's hand and then turned to run, at which point he was punched in the head, tackled to the ground and placed in a headlock by an unknown individual. According to the victim, he then observed defendant pick up a knife, come toward him and continuously stab him in his back several more times before backing away and making a celebratory gesture. The victim testified that he then managed to find his cousin, who transported him to the hospital.
The victim's cousin corroborated the victim's account of the altercation, testifying that he and the victim were leaving the party when they observed the acquaintance on the ground getting hit and kicked, prompting them to intervene. After pushing people off the acquaintance, the cousin turned and observed defendant standing behind the victim hitting him in the lower back and then standing face-to-face with the victim and hitting him in the stomach. The cousin noted that he did not witness a knife during the altercation, but after walking away toward his car with the acquaintance, the victim came over and told him that he had been stabbed. The cousin then transported the victim to the hospital, where he underwent emergency surgery. According to the victim's treating physician, the victim arrived at the hospital with nine significant puncture wounds, several of which were deep penetrating wounds that caused injuries to the victim's lung, diaphragm, spleen and small intestine and presented a danger of death.
Meanwhile, law enforcement was called to a different hospital upon a report of another patient with stab wounds and, upon arrival, encountered defendant, who had suffered a slight injury to his left hand during the altercation, and [*3]his brother, who was receiving treatment for several stab wounds. Law enforcement sought to obtain information concerning the altercation, but defendant and his brother refused to provide any details of the incident and did not want to seek criminal charges pertaining to the brother's injuries. As part of the investigation, law enforcement learned that defendant may have been responsible for the victim's injuries and, as a result, defendant was brought from the hospital to the State Police barracks for questioning. After waiving his Miranda rights, defendant explained that as he was leaving the house party, he saw people fighting and kicking his brother, which prompted defendant to intervene. According to defendant, he and his brother then left and, while driving home, he first observed his brother's wounds and took him to the hospital. During the initial interview, defendant stated that he never saw nor possessed a knife. Defendant was then taken to a different barracks to undergo a polygraph examination and was subsequently interrogated again. In the later interview, defendant explained that, upon attempting to render aid to his brother, the victim's acquaintance started to attack him with a knife and that he was able to grab the knife away from the acquaintance and was trying to defend himself by flailing the knife. Defendant described the knife to investigators and stated that he had the knife for about 30 seconds. However, defendant denied striking or stabbing anyone with the knife. Two forensic scientists testified to their analysis of defendant's clothing that was obtained from him while he was in custody. The first forensic scientist testified that she had obtained, among other items, various clippings from certain locations on defendant's shirt and that those clippings had presumptively tested positive for blood. The second forensic scientist testified that she had tested the clippings and that the victim's DNA was present in those locations.
For defendant's part, defendant's brother testified that he went to the house party with defendant and another individual. According to defendant's brother, he eventually went outside and tried to break up a fight, at which point he was punched by the victim's acquaintance. Defendant's brother testified that, while on the ground, he yelled for defendant to help and that defendant managed to push the attackers off, allowing the two to flee. Defendant's brother testified that he had three severe stab wounds after the altercation that required hospitalization. According to defendant's brother, the victim's acquaintance stabbed him and defendant's intervention in the altercation had saved his life. However, defendant's brother conceded that he did not see anyone wield a knife during the altercation. The defense also proffered the testimony of a friend of defendant's brother who was present for the fight. The friend testified consistent with defendant's brother's account, stating that she had observed the [*4]victim's acquaintance as the initial aggressor attacking defendant's brother. The friend described the altercation as a "big brawl" involving 10 to 15 people and denied seeing anyone get stabbed during the altercation. The friend also stated that, after the brawl had concluded, the victim's acquaintance physically attacked her.
Based on the foregoing, a different verdict would not have been unreasonable in this case, as the sum of testimony presented conflicting accounts of the altercation that resulted in the victim's injuries. Nevertheless, "when viewing the evidence in a neutral light and deferring to the jury's credibility determinations, we conclude that the verdict is not against the weight of the evidence" (People v Decamp, 211 AD3d at 1123; see People v Stines, 212 AD3d 883, 887 [3d Dept 2023], lv denied 39 NY3d 1113 [2023]; People v Calafell, 211 AD3d 1114, 1117-1118 [3d Dept 2022], lv denied 39 NY3d 1077 [2023]). The jury was presented with the accounts of the victim and his cousin, as well as defendant's brother and another witness. To this end, the victim testified that he had directly observed defendant stabbing him with a knife in the back and abdomen and, while the victim's cousin did not directly observe a knife, he provided an account as to the location of the blows that he observed defendant inflict on the victim while the two were engaged that was consistent with the location of the stab wounds suffered by the victim. Further, by his own account during his custodial interrogation, defendant admitted to wielding a knife for 30 seconds. Finally, defendant's brother and his friend offered an account of the altercation that supported the theory that defendant's actions were undertaken in self-defense, and the issues concerning the wounds to defendant's brother were fully explored during the direct and cross-examination. Nevertheless, noting the account of the altercation provided by the victim and deferring to the credibility determinations of the jury, we find that the decision to reject defendant's justification defense was supported by the evidence at trial (see People v Graham, 2023 NY Slip Op 01819 at *1; People v Decamp, 211 AD3d at 1123; People v Infinger, 194 AD3d 1183, 1187 [3d Dept 2021], lv denied 37 NY3d 965 [2021]; People v Every, 146 AD3d at 1162).
As to defendant's contention that he was denied meaningful representation, we are unpersuaded. Counsel who represented defendant during pretrial proceedings was not ineffective based upon his contentious exchanges with County Court (Williams, J.), as there is no indication that his remarks had any adverse effect on the representation or resulted in unfavorable rulings or unfair treatment by the court (see People v Glynn, 21 NY3d 614, 619-620 [2013]; People v Tetro, 181 AD3d 1286, 1287 [4th Dept 2020], lv denied 35 NY3d 1070 [2020]). Similarly without merit is defendant's contention that pretrial counsel's failure to submit a memorandum of law in support of a motion to suppress [*5]statements he made during custodial interrogation establishes that he received deficient representation. Defendant's brief arguments concerning the availability of potential meritorious suppression arguments are unpersuasive, and our review of the record reveals no indication that the motion had a substantial chance of success (see People v Gonyea, 211 AD3d 1102, 1105 [3d Dept 2022], lv denied 39 NY3d 1110 [2023]; People v Reichel, 211 AD3d 1090, 1091 [3d Dept 2022], lv denied 39 NY3d 1113 [2023]; see also People v Rivera, 201 AD3d 1132, 1134 [3d Dept 2022]; People v Swain, 168 AD3d 1130, 1133 [3d Dept 2019], lv denied 34 NY3d 938 [2019]).[FN1] Moreover, contrary to defendant's contention, we find that defendant's representation at trial, which was provided by newly appointed counsel, was far from deficient. To this end, the record reveals that counsel made appropriate opening and closing statements, engaged in effective cross-examination of the People's witnesses which highlighted any inconsistencies in their accounts of the altercation, successfully advocated for a missing witness charge, pursued a cogent and strategic theory based upon a justification defense, and, ultimately, counsel's efforts resulted in an acquittal of one of the two charged felonies (see People v Hayward, 213 AD3d 989, 994 [3d Dept 2023]; People v Bateman, 212 AD3d 993, 997 [3d Dept 2023], lv denied ___ NY3d ___ [Apr. 26, 2023]; People v Paige, 211 AD3d 1333, 1337 [3d Dept 2022], lv denied ___ NY3d ___ [Apr. 14, 2023]; People v LaDuke, 204 AD3d 1083, 1089 [3d Dept 2022], lv denied 38 NY3d 1072 [2022]). Defendant's remaining contentions concerning the scope of trial counsel's direct and cross-examination of certain witnesses or his failure to object to certain remarks by the People "are merely reflective of defendant's disagreement as to [trial] counsel's strategies and tactics weighed with the benefit of hindsight" (People v Burton, 215 AD3d 1054, ___, 2023 NY Slip Op 01919, *4 [3d Dept 2023]; see People v Hackett, 167 AD3d 1090, 1095 [3d Dept 2018]; People v Ildefonso, 150 AD3d 1388, 1388 [3d Dept 2017], lv denied 30 NY3d 980 [2017]).
Finally, defendant contends that his CPL 440.10 motion should have been granted and the judgment of conviction reversed owing to the People's undisputed Brady violation concerning certain impeachment evidence. "Brady is premised upon due process, which requires that the People disclose to the defendant any evidence in their possession that is material to guilt or punishment" (People v Mangarillo, 152 AD3d 1061, 1064 [3d Dept 2017] [internal quotation marks, brackets and citations omitted]). "A defendant seeking to establish a Brady violation must demonstrate that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (People v Stokes, 211 AD3d 1243, 1245 [3d Dept 2022] [internal [*6]quotation marks and citations omitted]; see People v Seeber, 94 AD3d 1335, 1336 [3d Dept 2012]).
The evidence at issue constitutes impeachment evidence concerning one of the two forensic scientists who testified for the People; specifically, substantiated allegations that said witness had cheated on her TruAllele qualification exam and subsequently lied to state investigators about her actions. Further, the People concede that such material was required to be turned over as impeachment evidence pursuant to Brady. Accordingly, the dispute here centers around the materiality of such evidence. To this end, "[w]here, as here, a defendant makes a specific request for undisclosed evidence, the materiality element is satisfied only if there exists a reasonable possibility that such evidence would have changed the result of the proceeding" (People v Stokes, 211 AD3d at 1245 [internal quotation marks, brackets and citations omitted], lv denied ___ NY3d ___ [Apr. 14, 2023]; see People v McGhee, 36 NY3d 1063, 1065 [2021]).[FN2]
The resolution of this case was almost entirely dependent on the jury's credibility determinations concerning the account of the altercation and defendant's justification for his actions and, as such, the forensic scientist's testimony concerning the identification of the victim's blood on defendant's shirt was not central to the verdict.[FN3] In this respect, the victim identified defendant as his assailant, and there is no dispute that defendant was involved in and possessed a knife during the fight. Further, the significance as to the blood found on defendant's shirt was its location on the shirt — which was testified to by the other forensic scientist pertaining to her preparation of the clippings of that shirt that were subsequently tested — rather than its origin. It is also notable that defendant's trial counsel utilized the location of the cuttings to advance his argument that the victim's account of the altercation was inconsistent with the physical proof. Under these circumstances, we find that "defendant has failed to show that prejudice arose because the suppressed evidence was material" and that a new trial is warranted (People v McGhee, 36 NY3d at 1066 [internal quotation marks and citations omitted]; see People v Wideman, 192 AD3d 1384, 1387 [3d Dept 2021], affd 38 NY3d 1067 [2022]; People v Smith, 138 AD3d 1418, 1419 [4th Dept 2016], lv denied 28 NY3d 937 [2016]; People v Johnson, 107 AD3d 1161, 1164 [3d Dept 2013], lv denied 21 NY3d 1075 [2013]; compare People v Negron, 26 NY3d 262, 270 [2015]; People v Williams, 50 AD3d 1177, 1180 [3d Dept 2008]).
Egan Jr., J.P., Lynch, Aarons and Fisher, JJ. concur.
ORDERED that the judgment and the order are affirmed.

Footnotes

Footnote 1: We further note that, although County Court stated that defendant had waived any argument for suppression as an alternative ground for denying his motion, it set forth a well-reasoned decision addressing the merits of any colorable suppression argument (see generally People v Brooks, 155 AD3d 1249, 1250 [3d Dept 2017]). Moreover, although it was different counsel representing defendant at trial, the substance of defendant's account during the interrogation was used in support of defendant's argument for a justification charge, which trial counsel noted was a strategic determination when declining a jury instruction concerning the voluntariness of defendant's statements (see People v Colburn, 123 AD3d 1292, 1297 [3d Dept 2014], lv denied 25 NY3d 950 [2015]; People v Nguyen, 90 AD3d 1330, 1333 [3d Dept 2011], lv denied 18 NY3d 960 [2012]).

Footnote 2: The People suggest that this Court should employ the reasonable probability standard based upon their assertion that defendant did not make a specific request for the impeachment material at issue (see People v Garrett, 23 NY3d 878, 891 [2014]; People v Mangarillo, 152 AD3d at 1065). However, the People did not raise any contention that the reasonable probability standard was applicable in their opposition to defendant's CPL 440.10 motion and, accordingly, that contention is unpreserved (see People v Dodt, 61 NY2d 408, 416 [1984]; People v Thompson, 118 AD3d 922, 924 [2d Dept 2014]; People v Graham, 211 AD2d 55, 58 [1st Dept 1995]). Nevertheless, it is our view that County Court's order directing the People to provide defendant with any "[i]nformation that impeaches the credibility of a testifying prosecution witness" satisfies the specific request requirement such that the reasonable possibility standard is applicable. To require defendant to request anything further beyond the court's order to disclose all relevant impeachment material imposes too great a burden, as it would effectively require defendant to identify every conceivable form of evidence that would allow for impeachment; rather, the burden lies with the People to provide such evidence under Brady (see generally People v Rong He, 34 NY3d 956, 958 [2019]; People v Auleta, 82 AD3d 1417, 1420 [3d Dept 2011], lv denied 17 NY3d 813 [2011]; People v Phillips, 55 AD3d 1145, 1149 [3d Dept 2008], lv denied 11 NY3d 899 [2008]).

Footnote 3: The People emphasize the difference between the DNA testing procedure utilized in this case and the procedure that concerned the forensic scientist's misconduct during the TruAllele certification process. However, regardless of the distinction between procedures, we find that proof of the forensic scientist's misconduct during the TruAllele certification process would be relevant impeachment evidence concerning her competence for any testing procedure. More importantly, the evidence was clearly pertinent to the forensic scientist's credibility, which could be readily challenged by proof of her cheating and subsequent untruthfulness during the investigation into such conduct.